**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| APEX MEDICAL RESEARCH, AMR, INC., and APEX MEDICAL RESEARCH, MI, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 15 C 2458 |
| AHMED A. ARIF, AA MRC, LLC, AHMED A. ARIF, M.D., P.C., and APEX MEDICAL RESEARCH OF FLINT, P.C., | ) ) ) ) ) | |
| Defendants. | ) ) | |
| ——————————————— | ) ) | |
| AHMED A. ARIF and AHMED A. ARIF M.D., P.C., | ) ) | |
| Counter-Plaintiffs, | ) ) | |
| v. | ) ) | |
| APEX MEDICAL RESEARCH, AMR, INC., APEX MEDICAL RESEARCH, MI, INC., and NUSRAT DEEN AHMED, | ) ) ) ) | |
| Counter-Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Before the Court are the parties' cross-motions for summary judgment. Apex Medical Research, AMR, Inc. ("Apex AMR"), moved for partial summary judgment pursuant to Federal Rule of Civil Procedure 56 on its claims for breach of contract and breach of fiduciary duty against Defendant Ahmed A. Arif ("Dr. Arif"). (R.30.) Plaintiffs and Counter-Defendants, Apex AMR and Apex Medical Research, MI, Inc. ("Apex Michigan" or "Apex-MI"), and

Counter-Defendant Nusrat Deen Ahmed ("Ms. Ahmed") (collectively, the "Apex Parties") also moved for summary judgment on Counter-Plaintiffs Dr. Arif and Ahmed A. Arif, M.D., P.C.'s ("Arif P.C.'s") unjust enrichment claim (Counterclaim II). (*Id.*) Defendants and Counter-Plaintiffs Dr. Arif and Arif P.C., along with Defendants AA MRC, LLC ("AA MRC") and Apex Medical Research of Flint, P.C. ("Apex Flint") (collectively, the "Arif Parties") responded with a cross-motion for partial judgment on the pleadings, or in the alternative, for summary judgment as to their declaratory judgment claim (Count VII of the Counterclaim) against the Apex Parties and as to the Apex Parties' breach of fiduciary duty claim (Count IV of the Amended Compl.). (R.34.)

A brief review of the underlying state court action and the alleged claims and counterclaims in the present action provides helpful context for the disputes in this case. On February 20, 2015, Plaintiff Apex AMR, filed this action in the Circuit Court of Cook County, Illinois, against Defendant Dr. Arif. (*See* R.1, Notice of Removal; R.1-1, *Apex Medical Research, AMR, Inc. v. Ahmed Arif*, Case No. 2015-L-1799, Circuit Court of Cook County, Illinois, Law Division, Complaint.) Plaintiff Apex AMR asserted two breach of contract claims against Dr. Arif. (R.1, ¶ 1; R.1-1, ¶¶ 18-25.) According to the Cook County complaint, "Apex-AMR represented by Azauddin Ahmed and Nusrat Ahmed, entered into a contract with its subsidiary, [Apex Michigan] represented by Arif, whereby Apex-AMR assisted [Apex Michigan] in acquiring and conducting medical trials at its offices." (R.1-1, ¶ 1; *id.*, Ex. 1, Contract Agreement between Apex Medical Research, AMR, Inc. & Ahmed A. Arif, MD ("the Agreement").) Apex AMR claimed that "[i]n violation of the contract, Arif, the principal physician of [Apex Michigan], started his own research site, AAMRC (Ahmed Arif Medical Research Center) and solicited Apex-AMR's preferred vendor." (R.1-1, ¶ 4.)

Defendant Dr. Arif removed the case to federal court pursuant to 28 U.S.C. §§ 1441 and 1446, premising federal jurisdiction on diversity, 28 U.S.C. § 1332. (*See* Stmt. of Undisputed Facts, ¶ 8.)[1] Plaintiffs Apex AMR and Apex Michigan have since filed their First Amended Complaint against Defendants Dr. Arif and AA MRC, related to the Agreement. (*See generally*, R.14, Am. Compl.) Plaintiffs allege breach of contract claims against Dr. Arif based on the Non-Compete Clause (Count I) and the Confidentiality Clause (Count II) of the Agreement, and further allege that Dr. Arif breached his fiduciary duty (Count IV). (*See* R.14, ¶¶ 45-50 (Count I); ¶¶ 51-56 (Count II); ¶¶ 65-70 (Count IV).) In addition, Plaintiffs allege various claims against both Dr. Arif and AA MRC, including misappropriation of trade (Count III), tortious interference with contract (Count V), tortious interference with business opportunities (Count VI), and conversion (Count VII). (*See* R.14, ¶¶ 57-64 (Count III); ¶¶ 71-78 (Count V); ¶¶ 79-85 (Count VI); ¶¶ 86-91 (Count VII).) Plaintiffs request injunctive relief restraining Defendants Dr. Arif and AA MRC from further breaches of the Non-Compete Clause and from disclosing or using trade secrets or confidential information. (*Id.*, at 17.) In addition to an award for actual damages, enhanced damages, punitive damages, and attorneys' fees and costs, Plaintiffs request an accounting of the business that Dr. Arif and AA MRC conducted in allegedly breaching their fiduciary duties and ask the Court to impose on the proceeds of that business a constructive trust for the benefit of Plaintiffs. (*Id.*)

---

[1] Citations to "Stmt. of Undisputed Facts" refer collectively to Arif Parties' Local Rule 56.1(b)(3)(A-B) Statement of Facts (R.31) and the Apex Parties' Responses (R.36). For purposes of clarity, the Court will use this citation reference where the fact preceding the citation is undisputed or admitted. "In determining what is disputed, we focus not only on whether the parties profess to dispute a fact, but also on the evidence the parties offer to support their statements. When we cite as undisputed a statement of fact that a party has attempted to dispute[] that reflects our determination that the evidence does not show that the fact is in genuine dispute." *Zitzka v. Vill. of Westmont*, 743 F.Supp.2d 887, 897 (N.D. Ill. 2010).

Defendants Dr. Arif and AA MRC responded with their Answer, Defenses, and Counterclaims asserting affirmative defenses for: (1) setoff; (2) statute of frauds; (3) equitable forfeiture; and (4) unclean hands. (R.21, Affirmative Defenses, ¶¶ 1-9.) In addition, Counter-Plaintiffs Dr. Arif and Arif P.C. alleged counterclaims against Counter-Defendants Apex AMR, Apex Michigan, and Ms. Ahmed. Specifically, Dr. Arif and AA MRC alleged counterclaims for breach of contract against Apex AMR (Counterclaim I); breach of fiduciary duty against Counter-Defendants Apex AMR, Apex Michigan, and Ms. Ahmed (Counterclaim III); fraud (Counterclaim IV) and conversion (Counterclaim V) against Apex AMR and Ms. Ahmed; statutory accounting (Counterclaim VI) against Apex Michigan and Ms. Ahmed; and unjust enrichment (Counterclaim II) and a declaratory judgment that the Agreement did not give rise to a joint venture, that it has been properly terminated by Dr. Arif, and that any entities associated with Dr. Arif are entitled to enter into new contracts without owing compensation (Count VIII) against Apex AMR and Apex Michigan. (*See* R.21, Counterclaims, ¶¶ 60-93.) After Defendants and Counter-Plaintiffs answered Plaintiffs' Amended Complaint, the Court granted the parties Stipulated and Agreed Order for Joinder of Additional Defendants Arif P.C. and Apex Flint—"two additional corporate entities, of which Dr. Arif is a shareholder, that received certain payments that Plaintiffs previously had alleged were received either by Dr. Arif directly or by AA MRC." [2] (R.26, ¶ 1.)

Counter-Defendants Apex AMR, Apex Michigan and Ms. Ahmed responded with their Answer to Counter-Plaintiffs' Counterclaims and Affirmative Defenses asserting their

---

[2] In doing so, the parties stipulated and agreed that "no separate amended complaint or answer was necessary upon the joinder of Ahmed A. Arif, M.D., P.C. and Apex Medical Research of Flint, P.C. because the substantive allegations, responses and affirmative defenses that would be set forth in further amended pleadings with respect to these additional Defendants would be the same as those already pled by Plaintiffs and previously named Defendants." (R.26, ¶ 2; *see also* R.21, Counterclaim, ¶¶ 3, 58.)

affirmative defenses that: (1) Counter-Plaintiffs fail to state a claim upon which relief can be granted; (2) setoff; (3) waiver; (4) election; (5) unclean hands; (6) prior material breach; (7) breach preventing performance; (8) lack of privity; (9) economic loss doctrine; (10) statute of frauds; and (11) equitable forfeiture. (*See generally*, R.29.)

Plaintiff Apex AMR has moved for partial summary judgment pursuant to Federal Rule of Civil Procedure 56 on its claims for breach of contract and breach of fiduciary duty against Defendant Dr. Arif. (R.30.) The Apex Parties have also moved for summary judgment on Counter-Plaintiffs' unjust enrichment claim (Counterclaim II). (*Id.*) The Arif Parties responded with a cross-motion for partial judgment on the pleadings, or in the alternative, for summary judgment as to Plaintiffs' breach of fiduciary duty claim (Count IV of the Am. Compl.) and the declaratory judgment claim (Count VII of the Counterclaim) against the Apex Parties. (R.34.) The Apex Parties also filed a motion to strike Defendants/Counter-Plaintiffs' Reply Memorandum in Support of their Motion for Partial Summary Judgment on the Pleadings or in the Alternative for Summary Judgment and in Further Opposition to the Apex Parties' Motion for Partial Summary Judgment. (R.42.) The Court denies the Apex Parties' motion to strike as the Arif Parties' Reply did not contain new arguments and further notes that the supplemental brief provided the Arif Parties the opportunity to respond to issues raised by the Apex Parties in their Response. The Court disregards any unsupported factual assertions raised in the Arif Parties' Reply. The Court also disregards new arguments raised and new exhibits presented for the first time in the Apex Parties' Motion to Strike.

Finally, in addition to opposing the Apex Parties' partial summary judgment, the Arif Parties moved for judgment on the pleadings, or in the alternative for summary judgment, as to Count IV of the First Amended Complaint and as to Count VII of their Counterclaim. (*See* R.34;

R.35.)  Under Rule 12(d) of the Federal Rules of Civil Procedure, a court must treat a motion for judgment on the pleadings as a motion for summary judgment if the parties submit matters outside the pleadings.  *See General Ins. Co. of America v. Clark Mall Corp.*, 644 F.3d 375, 378 (7th Cir. 2011) (*citing* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside of the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.")  The Court treats the present motions as ones for summary judgment based on both parties' reliance on facts outside of the pleadings and notes that the Apex Parties admit they will not suffer prejudice by this determination because they were on notice and submitted evidentiary materials in opposition to the Arif Parties' motion for partial summary judgment.  (*See* R.35, at 3-4.)

As outlined in the extensive briefing before the Court, the crux of the dispute between the parties revolves around the relationship and enterprise formed between the parties and the parties' performance under the Agreement—namely, Apex AMR's performance in distributing payment and Dr. Arif's performance in regard to AA MRC and redistribution of payments.  The dispute also highlights an issue that underlies many of the performance issues and therefore serves as a welcome preliminary determination—whether Dr. Arif effectively terminated the Agreement by notice letter sent December 9, 2014.

## BACKGROUND

### I.    Northern District of Illinois Local Rule 56.1

Northern District of Illinois Local Rule 56.1 "is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary."  *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (quoting

6

*Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 924 (7th Cir. 1994)).  Local Rule 56.1(a)(3)

requires the moving party to provide "a statement of material facts as to which the moving party

contends there is no genuine issue."  *Cracco v. Vitran Exp., Inc.,* 559 F.3d 625, 632 (7th Cir.

2009) (quoting L.R. 56.1(a)(3)).  The nonmoving party must file "a response to each numbered

paragraph in the moving party's statement, including, in the case of any disagreement, specific

references to the affidavits, parts of the record, and other supporting materials relied upon."  *Id.*

(quoting L.R. 56.1(b)(3)(B)).  The nonmoving party also may submit a separate statement of

additional facts that require the denial of summary judgment, including references to the

affidavits, parts of the record, and other supporting materials relied upon to support those facts.

*See* L.R. 56.1 (b)(3)(C); *see also Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643-44 (7th Cir.

2008).

The purpose of Rule 56.1 statements is to identify the relevant admissible evidence

supporting the material facts, not to make factual or legal arguments.  *See Cady v. Sheahan*, 467

F.3d 1057, 1060 (7th Cir. 2006) (finding Rule 56.1 statements incompliant when they fail to

adequately cite the record and are filled with irrelevant information, legal arguments, and

conjecture.")  The Court may disregard statements and responses that do not properly cite to the

record.  *See Cichon v. Exelon Generation Co., LLC*, 401 F.3d 803, 809-810) (7th Cir. 2005.)

Moreover, the requirements for responses under Local Rule 56.1 are "not satisfied by evasive

denials that do not fairly meet the substance of the material facts asserted."  *Bordelon v. Chicago*

*Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000); *see also Thele v. Sunrise Chevrolet,*

*Inc.*, No. 03 C 2626, 2004 WL 1194751, at *3 (N.D. Ill. May 28, 2004) ("The mere denial of a

particular fact without specific references to affidavits, parts of the record, and other supporting

materials is insufficient, and, where a properly supported factual assertion is met with such a

naked denial, the fact may be deemed admitted.")  "[D]istrict courts are entitled to expect strict compliance with Local Rule 56.1."  *Raymond v. Ameritech Corp*., 442 F.3d 600, 604 (7th Cir. 2006).

Prior to reciting the facts of this case, the Court notes a practice by the parties that is problematic under Local Rule 56.1.  In response to certain statements of fact, both parties state that they have insufficient knowledge to address the allegation.  (*See e.g.,* R.36, ¶¶ 33; R.39, ¶¶ 1, 2, 18, 20).  These are inappropriate responses.  If a party disputes a fact, it must point to record evidence in support of the denial.  To the extent that a party denies a statement of fact because it lacks knowledge, these facts will be deemed admitted without specific comment by the Court.  *See e.g., Bires v. WalTom, LLC*, 662 F.Supp.2d 1019, 1023 (N.D. Ill. 2009).

## II.     Relevant Facts

This dispute arises out of a contract that Dr. Arif and Apex AMR entered into in Illinois and that contemplates performance by the contracting parties in Illinois and Michigan.  (*See* Stmt. of Undisputed Facts, ¶ 10; *see also* R.38, at 2.)

### A.     The Relationship of the Parties

Apex AMR is a corporation organized and existing under the laws of the State of Illinois, with its registered office and principal place of business in Burr Ridge, Illinois.  (Stmt. of Undisputed Facts, ¶ 1.)  Apex Michigan is a corporation organized and existing under the laws of the State of Illinois, with its registered office and principal place of business in Burr Ridge, Illinois.  (*Id*., ¶ 2.)  Ms. Ahmed is an individual and a citizen of Illinois.  (*Id.*, ¶ 3.)  Dr. Arif is an individual, a citizen of Michigan, and is domiciled and resides in Flint, Michigan.  (*Id.*, ¶ 4.)  AA MRC is a limited liability company organized and existing under the laws of Michigan, with a principal place of business in Flint, Michigan.  (*Id.*, ¶ 5; R.14, ¶ 9.)  AA MRC has a sole member, Dr. Arif, a citizen of Michigan.  (R.14, ¶ 9.)  Arif P.C. is a professional service

corporation organized and existing under the laws of the State of Michigan, with Dr. Arif as the principal shareholder, and its principal place of business in Flint, Michigan. (Stmt. of Undisputed Facts, ¶ 6.) Apex Flint is a professional service corporation organized under the laws of the State of Michigan, with Dr. Arif as its registered agent, and with a registered office and principal place of business in Flint, Michigan. (*Id.*, ¶ 7.) Defendants removed this matter to federal court based on diversity jurisdiction pursuant to 28 U.S.C. § 1332. (*Id.* ¶ 8.)

Ms. Ahmed and Dr. Azazuddin Ahmed formed Apex AMR on July 15, 2005. (Stmt. of Undisputed Facts, ¶ 12.) Apex AMR is a clinical trials business that contracts with major pharmaceutical companies and other clinical trial sponsors to conduct clinical trials from sites in Illinois, Ohio and Michigan. (*Id.*, ¶ 13.)[3] Obtaining clinical trial work from a trial sponsor may depend on a principal investigator's professional reputation and goodwill. (*Id.*, ¶ 15.) Pharmaceutical companies and other clinical trial sponsors rely, in part, on existing relationships with clinical trial businesses when selecting research sites. (*Id.*, ¶ 16.) Apex AMR contracts with individual physicians, known as Principal Investigators, to conduct the clinical trials. (*Id.*, ¶ 14.)

Dr. Arif is a medical doctor licensed by the State of Michigan and maintains a medical practice in Flint, Michigan. (*Id.*, ¶ 17; Stmt. of Addt'l Undisputed Facts, ¶ 1.)[4] Dr. Arif was a medical school classmate of Dr. Azazuddin Ahmed. (Stmt. of Undisputed Facts, ¶ 18.) Although Dr. Arif has been conducting clinical trials at his offices at 1201 Flushing Road in Flint

---

[3] The Arif Parties clarify that this agreement was not for Apex AMR contracts for which Dr. Arif did not perform work. (*See* R.36, ¶ 21, Response.)

[4] Citations to "Stmt. of Addt'l. Undisputed Facts" refer collectively to Apex Parties' Local Rule 56.1(b)(3)(C) Statement of Additional Facts (R.37) and the Arif Parties' Response (R.39). For purposes of clarity, the Court will use this citation reference where the fact preceding the citation is undisputed or admitted.

Michigan since 2002, Dr. Arif discussed a collaboration with Dr. Ahmed and Ms. Ahmed, in 2006, to have Apex AMR act as Dr. Arif's agent for procuring clinical trial agreements. (*Id.*, ¶ 19; Stmt. of Addt'l Undisputed Facts, ¶ 1.) Prior to 2007, Dr. Arif had worked as a Principal Investigator in studies sponsored by pharmaceutical companies including Aventis Pharmaceuticals, TAP Pharmaceuticals, Norvo Nordisk, Bayer Pharmaceuticals and Pfizer. (Stmt. of Addt'l Undisputed Facts, ¶ 2.)

Apex AMR and Dr. Arif orally agreed in or around 2007 that, in exchange for Dr. Arif's designating his clinical trial location as an "Apex" site and serving as an Apex Principal Investigator, Apex AMR would seek clinical trial contracts for Dr. Arif to conduct at that site. (Stmt. of Undisputed Facts, ¶ 20.) Dr. Arif agreed with Apex AMR to share revenue relating to clinical trials he conducted as a Principal Investigator. (Stmt. of Undisputed Facts, ¶¶ 20, 21.) Specifically, Dr. Arif agreed to pay Apex AMR 15% of the clinical trial revenues for any contract obtained by Apex AMR under which Dr. Arif served as Principal Investigator—leaving 85% of the revenues for Dr. Arif. (*Id.*, ¶ 21; R.14-1, Section V.1.c.; R.21, Answer, ¶ 26.) At the start of their agreement, Apex AMR provided support to the Apex Michigan site, including: establishing email addresses on a server it controlled (@apexmedicalresearch.com) for Dr. Arif and his staff; providing a copy of a standard operating procedures manual, later revised by Dr. Arif's staff from a version for the Apex AMR's Chicago location to address the needs of the Apex Michigan site; and consulting with Dr. Arif's staff concerning questions on necessary regulatory forms for a trial sponsor. (Stmt. of Undisputed Facts, ¶ 22.)

### B. The Agreement

On June 11, 2011, Apex AMR and Dr. Arif entered into a written agreement (the "Agreement") in Chicago, Illinois. (Stmt. of Undisputed Facts, ¶ 23; R.14-1, Agreement, at 1.) As alleged by the Apex Parties, the Agreement memorialized the prior oral agreement between

Apex AMR and Dr. Arif pursuant to which (a) Apex AMR agreed to source clinical trials for Dr. Arif to perform, to provide him and his staff the necessary training, and to share with Dr. Arif the benefit of Apex AMR's industry knowledge, experience, and reputation, and (b) Dr. Arif agreed to conduct clinical trials in Michigan exclusively through Apex AMR.  (Stmt. of Addt'l Undisputed Facts, ¶ 8.)  The Agreement contemplated that the parties would form an entity named "[Apex Michigan] in which each party would have a 50% share.  (Stmt. of Undisputed Facts, ¶¶ 26, 28; R.29, Plfs' Answer to Counterclaims, ¶ 25.)  The Agreement further provided that Dr. Arif was aware that clinical trial agreements negotiated by Apex AMR used the Apex Michigan name.  (Stmt. of Undisputed Facts, ¶ 26.)  On June 27, 2011, Apex Michigan was formed.  (*Id.*, ¶ 27; Stmt. of Addt'l Undisputed Facts, ¶ 10.)  According to the Apex Parties, "[t]he purpose of forming [Apex Michigan] was to develop a Michigan clinical trials business that could be sold in a few years for a profit divided equally between the joint venturers."  (Stmt. of Addt'l Undisputed Facts, ¶ 11; R.21, ¶ 25.)

Pursuant to the Agreement, Dr. Arif and Apex AMR agreed to, *inter alia*, the following terms:

> II.  Covenant of Good Faith.  The parties mutually represent and covenant that at all times prior to this Agreement, they have dealt fairly and in good faith.  The parties mutually represent and covenant that at all time[] during the term of this Agreement, they shall deal with each other fairly and in good faith.  Whenever consent or approval is required of either Party, it shall not be withheld or delayed without good cause.

> IV.  Obligations of the Parties with Respect to Services.
>   1.  For the term of this Agreement, Apex-AMR shall provide to Apex-MI the following:
>       a.  Apex shall provide to Apex-MI new grant opportunities and research related expertise in conducting clinical trials.
>       b.  Apex-AMR shall provide Apex-MI new grant opportunities and research related expertise in conducting clinical trials.
>       c.  Apex-AMR shall negotiate and review all Clinical Trial Agreements.

       d.  Apex-AMR shall provide guidance related to marketing and recruitment of study subjects . . .

2. For the term of this Agreement, Apex-MI shall be responsible for the following:
   a. Apex-MI agrees to not seek or accept any clinical trials not procured under the terms of this Agreement.
   b. Apex-MI agrees to conduct all clinical trials and acts leading to obtaining clinical trials according to the instructions, policies, and principles of Apex-AMR . . .

## V. Obligations of the Parties in Reference to Division and Distribution of Fees.

1. For the term of this Agreement the income, costs, and profit shall be determined as follows: . . .

   b. Costs – All costs related to conduct of the research shall be borne solely by Apex-MI.  All costs of procuring clinical trial grants shall be borne by Apex-AMR.  All costs incurred after the procurement of [a] clinical trial grant shall be borne by Apex-MI.
   c. Distribution
      i. Total Grant Revenue shall be divided as follows:
         1. [85%] to Apex-MI.
         2. [15%] to Apex-AMR
      ii. Grant revenue shall be distributed to Apex-MI within ten (10) business days of Apex receiving the grant payment from the sponsor.

## VI. Liability.

1. In the performance of the services, duties, and obligations undertaken by Apex-MI under this Agreement or any clinical trial obtained as a result of this Agreement, it is mutually understood and agreed that Apex-MI will at all times act and perform as an independent entity.  Apex-AMR shall not have, nor exercise any direct control over the methods by which Apex-MI shall perform professional work and services except that Apex-MI agree[s] to perform their work and services at all times in strict accordance with the research protocol, policies and timeless provided by sponsor and currently approved methods of the practice of clinical research.
   …

## V. Obligations Upon Termination of the Agreement.

1. Either party may terminate this agreement without cause within sixty (60) days written notice to the other party.
   …

## IX. Non-Compete Clause.

1. All research activities conducted by Apex-MI and its subsidiaries/investigators will execute all contract agreements through Apex,

AMR [sic]. The agreement will be deemed effective until all subjects for
every protocol complete[] LPLV – Last Patient Last Visit.

    1. Contact or solicit any Active Clients for the purpose of providing
services similar to those provided by Apex-AMR as a result of
services provided by Apex-AMR during the Measurement Period;

    2. Request or advise any Active Clients, suppliers, vendors or employees
of Apex who currently have, or have had business relationships with
Apex-AMR during the Measurement Period, to withdraw, curtail or
cancel any of their business or relations with Apex-AMR

2. Induce or attempt to induce any employee of Apex-AMR with whom Apex-
MI had contact during the Measurement Period to terminate his or her
relationships or breach any of his or her agreements with the Apex-AMR.

(Stmt. of Undisputed Facts, ¶ 25; Stmt. of Addt'l Undisputed Facts, ¶¶ 5-7; R.14-1.) As

provided by the Agreement, upon the formation of Apex Michigan, it would issue shares to both

Apex AMR and Apex Michigan based on Apex AMR's representations that Dr. Arif was

assigned a 50% interest in Apex Michigan. (Stmt. of Undisputed Facts, ¶ 28.) Apex Michigan

and Apex AMR each have one director, Ms. Ahmed. (*Id.*, ¶¶ 30, 31.) Ms. Ahmed is the 60%

shareholder of Apex AMR, with her children holding the remaining shares. (*Id.*, ¶ 32.) Since its

inception, no purchase, sale or other transfer of Apex Michigan stock has occurred. (*Id.*, ¶ 33.)

Dr. Arif is not an officer or director of Apex Michigan. (Stmt. of Addt'l Undisputed Facts, ¶ 13.)

The Agreement is the sole document setting forth the parties' responsibilities as Dr. Arif never

executed an additional written shareholder agreement concerning the operation of Apex

Michigan. (Stmt. of Addt'l Undisputed Facts, ¶ 12; R.29, ¶ 27.)

After execution of the Agreement, Dr. Arif continued to work as Principal Investigator

for studies conducted at his Flint, Michigan clinical site under contracts negotiated by Apex

AMR. (Stmt. of Undisputed Facts, ¶ 34.) Each clinical trial contract was in the name of either

Apex AMR or Apex Michigan and Dr. Arif signed the clinical trial contracts as the Principal

Investigator. (*Id.*, ¶ 35; Stmt. of Addt'l Undisputed Facts, ¶ 30.) During the term of the

Agreement, Apex AMR negotiated clinical trial agreements for Dr. Arif to conduct from the

Apex Michigan site. (Stmt. of Undisputed Facts, ¶ 36.) Apex AMR—by Ms. Ahmed—also continued to provide consultation with Dr. Arif's staff to address questions concerning necessary regulatory forms for a trial sponsor. (*Id.*, ¶ 37.) Under the Agreement, Dr. Arif agreed to contract with trial sponsors exclusively through Apex AMR. (*Id.*, ¶ 39.)

### C. The Dispute

In August of 2014, Dr. Arif asked a new employee of Arif P.C. to review the payments that Apex AMR should have received from trial sponsors and then had his staff contact the trial sponsors directly to determine what payments they had made to Apex AMR. (Stmt. of Addt'l Undisputed Facts, ¶ 18.) The review revealed that, for a study done for Merck, Sharp & Dohme in 2013, Apex AMR retained the entire proceeds of five payments that it had received between July 2013 and July 2014 and had not paid Dr. Arif his share of this study. (*Id.*, ¶ 19.)

On December 9, 2014, Dr. Arif, through counsel, sent a letter to Apex AMR which stated, among other things, that "Dr. Arif is exercising his rights to terminate the Agreement." (Stmt. of Undisputed Addt'l Facts, ¶¶ 20, 21.) The December 9, 2014 letter further stated:

> "Under Article IV of the Agreement Apex is obligated to provide research related expertise in marketing and recruitment of study subjects. Since the inception of the Agreement Apex has failed to perform the foregoing …"

> "Dr. Arif recently learned that Apex has failed to perform its obligations under the Agreement by not paying Dr. Arif upon receipt of proceeds from clinical trial studies and by not submitting invoices/billings to the companies for which the clinical trials are being performed."

> "As a result of Apex's breach of the Agreement, Dr. Arif is exercising his rights to terminate the Agreement."

> "In addition, Dr. Arif will directly invoice/bill the companies for which he is (or has) performed clinical studies."

> "Although Dr. Arif would be well within his rights to retain 100% of all such proceeds as a result of Apex's breach, Dr. Arif has elected to distribute the proceeds in the manner such proceeds have under the Agreement."

(Stmt. of Undisputed Facts, ¶ 48; Stmt. of Undisputed Addt'l Facts, ¶¶ 20, 21; R.21, ¶ 53; R.14-2, Letter dated Dec. 9, 2014 to Ms. Ahmed.)  Dr. Arif provided notification that he was attempting to terminate the Agreement in his December 9, 2014 letter.  (Stmt. of Undisputed Facts, ¶ 50.)

After Apex AMR filed the state court action against Dr. Arif, the Apex Parties responded and remitted a payment related to the work performed under the Merck, Sharp & Dohme agreement in a letter dated April 29, 2015.  (Stmt. of Addt'l Undisputed Facts, ¶¶ 19, 24; R.36-2, Martin Decl., ¶ 4, Ex. 3, Letter dated April 29, 2014 to Mr. Martin.)[5]  The April 29, 2015 letter enclosed a check for $18,009.29 to purportedly "rectify the error" of the Merck, Sharpe & Dohme payments.  (Stmt. of Addt'l Undisputed Facts, ¶ 24.)  Dr. Arif returned the check on May 12, 2015, along with a cover letter making a demand to inspect the corporate records of Apex Michigan, referencing 805 ILCS 5/7.75.  (Id., ¶¶ 15, 25; R.36-2, Martin Decl., ¶ 4, Ex. 4, Letter dated May 12, 2015 to Mr. Din.)  Apex AMR denied that Dr. Arif had a right to demand to examine corporate records of Apex AMR pursuant to 805 ILCS 5/7.75 because Dr. Arif was not a shareholder of Apex AMR.  (Stmt. of Addt'l Undisputed Facts, ¶ 16.)

Subsequent to Dr. Arif's December 9, 2014 letter stating his intention to terminate the Agreement, he has continued to perform the services as a Principal Investigator under the separate clinical trial contracts procured by Apex AMR or Apex Michigan as required by those individual clinical trial contracts.  (Stmt. of Undisputed Facts, ¶ 51.)  Dr. Arif has not terminated

_____

[5] Although the letter reflects "April 29, 2014" (see R.36-2, at PageID #291, Letter from K.Din to J.Martin), the parties' references to the letter as written in 2015 in later correspondence as well as in Rule 56.1 Statements of Fact render the date undisputed and the Court references the letter as written on April 29, 2015.  (See R.36-2, at PageID #293, Letter from J.Martin to K.Din, dated May 12, 2015 (referencing "your letter, dated April 29, 2015 (though the letter reflects 2014)"); R.36-2, at PageID # 300, Letter from M.Prewitt to J.Martin dated July 24, 2015 (referencing "a letter dated April 29, 2015"); see also R.39, ¶¶ 19, 24, 25.)

any pending clinical trial agreements contracted by Apex AMR. (*Id.*, ¶ 52.) Dr. Arif has stated

that he intends to complete his work under the pending clinical trial agreements contracted by

Apex AMR until the conclusion of each study (the date of the "last patient last visit" for a study).

(*Id.*, ¶ 53.) Dr. Arif or his staff have contacted certain clinical trial sponsors under contracts

negotiated by Apex AMR for which Dr. Arif continues to serve as Principal Investigator to ask

that these sponsors make payments to Dr. Arif or Apex Flint directly. (*Id.*, ¶ 44.) Apex AMR

demanded that Dr. Arif cease collecting payments directly from clinical trial sponsors. (*Id.*,

¶ 45.) Dr. Arif has continued collecting payments directly from clinical trial sponsors under

Apex AMR contracts. (*Id.*, ¶ 46.)

In addition, Dr. Arif and his staff have ceased to inform Apex AMR of requests they have

received from clinical trial sponsors to conduct new clinical trials and are instead pursuing those

opportunities for the benefit of an entity called AA MRC. (*Id.*, ¶ 47.) In May 2014—before Dr.

Arif sent his termination letter and before he inquired as to payments—Dr. Arif formed AA

MRC. (*See id.*, ¶ 40.) Dr. Arif uses AA MRC as the contracting entity to enter into new clinical

trial agreements with third party sponsors, independent of Apex AMR and Apex Michigan. (*Id.*,

¶ 41.) Apex AMR and Apex Michigan have no affiliation or contractual relationship with AA

MRC. (*Id.*, ¶ 42.) Although the Arif Parties deny they required any consent, Apex AMR did not

provide consent to Dr. Arif to form AA MRC. (*Id.*, ¶ 43.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the admissible evidence shows that no genuine

dispute exists as to any material fact and the movant is entitled to judgment as a matter of law.

*See* Fed. R. Civ. P. 56(a). "A 'material fact' is one identified by the substantive law as affecting

the outcome of the suit." *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 681 (7th Cir. 2014) (citing

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "A 'genuine issue' exists with respect to any such material fact, and summary judgment is therefore inappropriate, when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Conversely, "where the factual record taken as a whole could *not* lead a rational trier of fact to find the nonmoving party, there is nothing for a jury to do." *Bunn*, 753 F.3d at 682 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original)).

In determining whether a genuine issue of material fact exists, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. *See Bunn*, 753 F.3d at 682 (citing *Anderson*, 477 U.S. at 255); *see also Kvapil v. Chippewa County, Wis.*, 752 F.3d 708, 712 (7th Cir. 2014). However, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 248 (emphasis in original). In reviewing evidence opposing a motion for summary judgment, courts are not obliged to entertain a "metaphysical doubt." *Matsushita*, 475 U.S. at 586. The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013).

## ANALYSIS

Faced with the mirrored claims and counterclaims of the Apex Parties' claims for breach of contract and breach of fiduciary duty and the Arif Parties' claims for declaratory judgment of termination and no breach of fiduciary duty, the Court turns first to the Agreement and addresses the threshold issue of whether Dr. Arif's termination of the Agreement was valid.

## I.    Termination of the Agreement

### A.    Dr. Arif's Valid Termination of the Agreement

The Arif Parties' motion for summary judgment seeks a determination that Dr. Arif's termination of the Agreement was valid and that they are entitled to enter into new contracts for clinical trials for which they will not owe compensation to the Apex Parties.  (*See* R.35, at 10.)  The Agreement dictates, and the parties do not dispute, that Illinois law applies.  (*See* R.14-1, Section XV.)

"Contractual provisions providing for termination of an agreement are generally enforceable according to their terms."  *Hunt v. Farmers Ins. Exch.*, 357 Ill. App. 3d 1076, 1078, 831 N.E.2d 1100, 1102, 294 Ill. Dec. 775 (Ill. App. Ct. 2005); *S & F Corp. v. Am. Express Co.*, 60 Ill. App. 3d 824, 829, 377 N.E.2d 73, 77, 17 Ill. Dec. 883 (1978).  "It has long been held by Illinois courts that words used in a contract must be given their 'plain and ordinary meaning.'"  *Hunt*, 831 N.E.2d at 1102 (*citing Young v. Allstate Ins. Co.*, 351 Ill. App. 3d 151, 158, 812 N.E.2d 741, 749, 285 Ill. Dec. 921 (Ill. App. Ct. 2004)).  "A contract term is not ambiguous merely because it is undefined in the contract, nor does an ambiguity arise 'because the parties can suggest creative possibilities for its meaning.'"  *Id.* (*citing Chatham Corp. v. Dann Ins.,* 351 Ill. App. 3d 353, 358, 812 N.E.2d 483, 488, 285 Ill. Dec. 663 (2004) (quoting *Lapham–Hickey Steel Corp. v. Protection Mutual Ins. Co.,* 166 Ill.2d 520, 529, 655 N.E.2d 842, 846, 211 Ill. Dec. 459 (1995))).

The Agreement states that "[t]he term of this Agreement shall be in place as long as Apex-MI continues to conduct medical research."  (R.14-1, Section III.)  The Agreement then provides the obligations of the parties with respect to services and division and distribution of fees.  (*See id.*, Sections IV, V.)  The Agreement also clearly sets forth the parties' "Obligations

Upon Termination of the Agreement", stating: "[e]ither party may terminate this agreement without cause within sixty (60) days written notice to the other party". (*Id.*, Section VII.1.) The Agreement further contemplates that if Apex Michigan terminates the contract, it "shall compensate Apex for damages related to any liability incurred by Apex-AMR due to such termination." (*Id.*, Section VII.2.) The Apex Parties make no argument, nor is there any evidence in the record to suggest, that the termination clause is ambiguous. *See Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 394 (7th Cir. 2003) (finding a termination provision unambiguous and enforceable where the contract stated "that the agreement may be terminated at any time by either party without cause by giving at least sixty days written notice to the other party"). It is undisputed that the Agreement expressly allows either party to terminate without cause "within sixty (60) days written notice" and it is further undisputed that Apex AMR received a letter from Dr. Arif on December 9, 2014, stating that he was "exercising his rights to terminate the Agreement". (Stmt. of Undisputed Facts, ¶ 50; Stmt. of Addt'l Undisputed Facts, ¶ 6; R.21 & R.29, ¶¶ 53, 55; *see also* R.38, at 3; R.41, at 2.)

Faced with these undisputed facts, Dr. Arif provided proper notice for the Agreement's termination, sixty days after notice—effective February 7, 2015. *See e.g., Paragon Micro, Inc. v. Bundy,* 22 F. Supp. 3d 880, 887 (N.D. Ill. 2014) (*citing Rakowski v. Lucente,* 104 Ill. 2d 317, 84 Ill. Dec. 654, 472 N.E.2d 791, 794 (1984)) ("Under Illinois law, if the terms of a contract are clear and explicit, a court must enforce the contract as written"); *see also Cromeens,* 349 F.3d at 394 (7th Cir. 2003); *Suburban Auto Rebuilders, Inc. v. Associated Tile Dealers Warehouse, Inc.*, 388 Ill. App. 3d 81, 90-91, 902 N.E.2d 1178, 1188 (2009) (citing *Rakowski,* 104 Ill.2d at 323) ("Where the terms of a contract are clear and explicit, a reviewing court must enforce them as written"); *accord. Arlington Fin. Corp. v. Ben Franklin Bank of Ill.*, No. 98 C 89567, 1999 WL

89567, at *5 (N.D. Ill. Feb. 16, 1999) (finding under Illinois law that the plaintiff had a reasonable expectancy that business relationships would continue for at least sixty days after notification of termination where the loan purchase agreements contained a sixty-day notice period for termination). The Apex Parties argue, however, that this termination does not stand in the wake of Dr. Arif's actions affirming the Agreement as still binding and effective after his notice of termination. Namely, the Apex Parties contend Dr. Arif's continued demands of payment for work he was obligated to perform (or had already performed prior to December 2014) under the third party clinical trial agreements entered into prior to termination resurrected the Agreement. The Apex Parties further argue that the doctrine of election of remedies makes Dr. Arif's termination ineffective because he is still enjoying the benefits of the Agreement. The Court disagrees.

In asserting that Dr. Arif's termination is ineffective due to his continued performance, the Apex Parties rely on the contract law doctrine of election of remedies which states: "[i]f a party to a contract breaks it, the other party can abandon the contract … and sue for damages, or it can continue with the contract and sue for damages." *Emerald Invs. Ltd. v. Allmerica Fin. Life Ins. & Annuity Co.*, 516 F.3d 612, 618 (7th Cir. 2008) (citations omitted) (applying Illinois law). "But if [the other party] makes the latter election, it is bound to the obligations that the contract imposes on it." *Id.* (citations omitted). The cases upon which the Apex Parties rely, however, show the application of this doctrine in the wake of a material breach—not the exercise of an express clause for termination without cause. *See e.g., Emerald Invs. Ltd.*, 516 F.3d 612; *Empire Elecs., Inc. v. D&D Tooling and Mfg., Inc.*, No. 13 C 376, 2014 WL 5819728 (N.D. Ill. Nov. 10, 2014) (addressing the effect of the parties' actions on damages in continuing to perform and not terminating the contract after the plaintiff's material breach). Indeed, in *Emerald Invs. Ltd.*, the

Seventh Circuit provides the above description of the doctrine of election of remedies as a legal definition of "partial breach". *Id.*, 516 F.3d at 615. The Seventh Circuit also recognized the difference between a breach of contract and a termination, stating: "[t]here is a breach of contract, and there are alterations and terminations that are not breaches." *Id.*, at 618. The parties in *Emerald Invs. Ltd.*—dealing in the sale of variable annuities—did not contest the district court's determination that imposition of a limit for the number of transfers customers could make each month constituted a breach of the underlying contract. *Id.*, at 615. Instead, they argued over the amount of damages the court should award in the wake of that breach, and in doing so, the Seventh Circuit called upon the doctrine of election of remedies to explain the options available to the parties. *Id.*, at 618. The Seventh Circuit observed that once the breach occurred, the plaintiff "could have terminated the contract … [b]ut it did not." *See id.*, at 618.

The analysis as applied in *Emerald* is not applicable here, where Dr. Arif's actions and options under the Agreement are in stark contrast to the *Emerald* parties' actions. Dr. Arif exercised his right to a termination without cause. The fact that Dr. Arif's termination letter references the actions of Apex AMR as an alleged breach in failing to make payments does not erase Dr. Arif's choice to exercise his termination rights. *See Rudolph v. Int'l Bus. Machines Corp.*, No. 09 C 428, 2009 WL 2632195, at *4 (N.D. Ill. Aug. 21, 2009) (*citing L.A.P.D., Inc. v. Gen. Elec.*, 132 F.3d 402, 404 (7th Cir. 1997)) (emphasis added) ("if a contract allows a party to modify or terminate the contract without cause [under Illinois law], "use of that power is not contingent on satisfying a court that the decision was an exercise of 'good faith and fair dealing.' One party need not reveal to the other the criteria that will lead it to terminate the relation, when the contract allows *any* reason (or none) to suffice"). The Apex Parties do not cite case law or point to a provision in the Agreement that permits the Court to ignore Dr. Arif's exercise of his

clear right to terminate the Agreement.  Given the explicit language of the termination provision and Dr. Arif's proper exercise of that provision, the Apex Parties' reliance on cases that deal with the doctrine of election of remedies to repudiate a contract in the wake of a material breach is, therefore, misplaced.

In addition, the Apex Parties rely on Dr. Arif's continued clinical trial performance after termination as evidence that because he is still enjoying the benefits of the contract, the Court should hold him to its exclusivity provision.  Again relying on the doctrine of election of remedies, the Apex Parties state "[a] party is never permitted to disclaim its own contractual obligations and yet continue to enjoy the benefits of the same contract."  (R.32, at 9.)  While this statement may be true, the doctrine does not apply here, as discussed above.  Even assuming it were applicable, the undisputed facts show that Dr. Arif is no longer enjoying the benefits of the Agreement.  As clearly stated in the Agreement, "Apex-AMR and Apex-MI are seeking to enter into an arrangement whereby Apex-AMR will assist Apex-MI in acquiring and conducting clinical trials at the offices designated by Apex-MI in Michigan."  (R.14-1, at 1.)  Furthermore, "[t]he purpose of [the Agreement] is to provide an arrangement between Apex-AMR and Apex-MI whereby Apex-AMR will provide grant opportunities and thereof to [] Apex-MI in conducting clinical trials."  (*Id.*)  Following the execution of the Agreement, Dr. Arif informed Apex AMR of opportunities for work on new clinical trials.  (R.29, Answer to Counterclaim, ¶ 31.)  Although the parties dispute who is at fault for the lost communication, indeed, since Dr. Arif sent his termination notice letter on December 9, 2014, the parties have not had substantial contact concerning clinical trial work and are no longer negotiating with one another to arrange for clinical trial agreements with third parties.  (Stmt. of Addt'l Undisputed Facts, ¶ 28.)

Moreover, the Agreement permitted either party to terminate it without cause with 60 days written notice.

Dr. Arif's actions related to the third party clinical trial agreements already in place when he terminated the Agreement are indicative of his performance not under the Agreement, but instead under the separate clinical trial agreements. Indeed, Apex AMR is not a party to all of the clinical trial agreements, as the Apex Parties admit that Dr. Arif "typically has signed the clinical trial agreements in his capacity as Principal Investigator, while Apex Michigan is the contracting party." (*See* Stmt. of Addt'l Undisputed Facts, ¶ 30; *see also* R.39-2, US Clinical Trial Agreement, at Apex_0003.) Even viewing the facts in the light most favorable to the Apex Parties, Dr. Arif is no longer arranging new clinical trial agreements with the Apex Parties and, therefore, Dr. Arif is no longer benefitting from the Agreement.

Furthermore, the Apex Parties do not point to—and the Court does not find—any portion of the Agreement that dictates co-termination of Dr. Arif's continuing obligations under the separate third party clinical trial agreements with termination of the Agreement. Indeed, the Agreement provides for the opposite of what the Apex Parties advocate—continuation of the clinical trial agreements entered into by Apex Michigan through Apex AMR "until all subjects for every protocol completes LPLV – Last Patient Last Visit." (R.14-1, at Section IX.)[6] The

---

[6] The Court finds the reference to "agreement" in the second sentence of the Non-Compete Clause to refer back to the "contract agreements through [Apex AMR]" referred to in the immediately preceding sentence and not a reference to the "Agreement" at issue between Dr. Arif and Apex AMR. (*See* Section IX.1, Non-Compete Clause.) This interpretation is consistent with the Agreement's reference to itself as "Agreement"—in capital letters—throughout its entirety. (*See generally*, R.14-1.) The finding is also consistent with the Non-Compete Clause's later reference in Section IX to the "Measurement Period", a period defined by the Agreement as "the term of this Agreement". (*See* R.14-1, Section XVI, Definitions.) Had the parties intended for the Agreement and the third party clinical trials procured as a result of the Agreement to have the same termination date, they could have defined the "Measurement Period" or another term as referring to both, but did not. *See Gallagher v. Lenart*, 367 Ill. App. 3d 293, 301, 854 N.E.2d 800, 807, 305 Ill. Dec. 208 (Ill. App. Ct. 2006) (citation omitted)) ("A presumption exists against provisions that easily could have been included in the contract but were not").

Agreement further provides that Dr. Arif "will at all times act and perform as an independent entity" in performing "the services, duties, and obligations undertaken by Apex-MI under … any clinical trial obtained as the result of this Agreement."  (*Id.*, Section VI.1.)

Had the parties intended to condition termination of the Agreement on Dr. Arif or Apex Michigan's concurrent termination of all third party clinical trial agreements that were negotiated during the term of the Agreement, they could have done so.  *See Gallagher v. Lenart*, 367 Ill. App. 3d 293, 301, 854 N.E.2d 800, 807, 305 Ill. Dec. 208 (Ill. App. Ct. 2006) (*citing Lee v. Allstate Ins. Co.*, 361 Ill. App. 3d 970, 979, 838 N.E.2d 15, 24, 297 Ill. Dec. 528 (Ill. App. Ct. 2005)) ("A presumption exists against provisions that easily could have been included in the contract but were not").  Nor would termination of those previously formed third party clinical trial agreements make sense as there would be no benefit to Apex AMR since the Agreement specifies that all costs incurred once a clinical trial is procured are borne by Apex Michigan, "represented by [Dr. Arif]".  (*See* R.14-1, Section V.1.b., "Costs".)  Moreover, Dr. Arif signed the clinical trial agreements as Principal Investigator and the Apex Parties fail to point to language that affords him the freedom to simply disregard his obligations of performance under those agreements.  (Stmt. of Undisputed Facts, ¶ 35; Stmt. of Addt'l Undisputed Facts, ¶ 30; R.29, Answer to Counterclaims, ¶ 30.)  As demonstrated by at least one of the clinical trial agreements, Dr. Arif is obligated to "guarantee[] the proper performance by the Investigator [Dr. Arif] of all [his] obligations hereunder."  (R.39-2, at Apex_0006.)[7]

Accordingly, no genuine issues of material fact exist precluding the finding that Dr. Arif properly exercised his termination rights under Section VII.1. of the Agreement and that the

---

[7] For these same reasons, Dr. Arif is not estopped from arguing termination of the Agreement while he is still conducting the separate clinical trials entered into during the Agreement.  *See Transatlantic Reinsurance Co. v. Nat'l Indemnity Co.*, 2014 WL 2862280, at *4 (N.D. Ill. June 24, 2014) (rejecting claim of "direct benefit" estoppel when the benefit arose under a separate contract).

Agreement terminated on February 7, 2015—sixty days after Apex AMR received Dr. Arif's termination notice.[8]  The Court, therefore, grants in part the Arif Parties' motion for summary judgment as related to Count VII for declaratory judgment.

> **B.      No Basis for Enjoining Dr. Arif from Engaging in Clinical Trial Research**

The Apex Parties seek to enforce the exclusivity provision of the Agreement against Dr. Arif.  Because Dr. Arif successfully terminated the Agreement as of February 7, 2015, however, he is not bound by the exclusivity provision that the Apex Parties admit was an "in-term exclusivity provision".

The Apex Parties rely on two provisions in the Agreement as a basis for exclusivity—Section IV.2.a and Section IX.1.  (*See* R.32, at 8.)  Section IV.2.a of the Agreement provides that "[f]or the term of this Agreement … [Apex Michigan] agrees to not seek or accept any clinical trials not procured under the terms of this Agreement."  (R.14-1, Section IV.2.)  Section IX.1 of the Agreement provides that "[a]ll research activities conducted by [Apex Michigan] and its subsidiaries/investigators will execute all contract agreements through [Apex-AMR].  The agreement will be deemed effective until all subjects for every protocol completes LPLV – Last Patient Last Visit."  (R.14-1, Section IX.1.)  The Arif Parties characterize these provisions as "in-term" non-compete and "in-term exclusivity requirements", admitting that the duration of the provisions are limited to the duration of the contract.  Indeed, the case upon which the Apex Parties rely indicates that "in-term" non-compete covenants have a limited duration and only last "during the contractual relationship of the parties".  (*See* R.32, at 8 (*citing Vendo Co. v. Stoner*, 105 Ill. App. 2d 261, 273, 245 N.E.2d 263 (Ill. App. Ct. 1969)).)  Any "in-term" exclusivity

---

[8] The Court's determination that Dr. Arif validly terminated the Agreement is not also a determination as to any compensation owing between the parties stemming from the Apex AMR and Apex Michigan contracts entered into during the Agreement.

provisions of the Agreement, therefore, ended when the contractual provisions between Dr. Arif

and Apex AMR ended.  Accordingly, the Court grants in part the Arif Parties' motion for partial

summary judgment and finds that Dr. Arif terminated the Agreement and is, therefore, entitled to

enter into new contracts for clinical trials for which no compensation will be owed to the Apex

Parties under those new trials.[9]

## II.      Apex AMR Is Not Entitled to Judgment as a Matter of Law on its Breach of Contract Claim

Plaintiff Apex AMR moves for summary judgment on its breach of contract claim against

Dr. Arif.  (*See* R.30.)   Because the Court finds that Dr. Arif properly terminated the Agreement

by notice sent on December 9, 2014—effective February 7, 2015, the Court denies as moot

Plaintiff's arguments that rely on a finding of breach of contract after the effective date.  Plaintiff

does assert, however, that some of Dr. Arif's actions taken prior to that date constitute a breach.

As such, the Court addresses these arguments below.

Under Illinois law, "[t]o prevail on a breach of contract claim, a plaintiff must establish

the existence of a valid and enforceable contract, plaintiff's performance, defendant's breach of

the terms of the contract, and damages resulting from the breach."  *Spitz v. Proven Winners N.*

*Am., LLC*, 759 F.3d 724, 730 (7th Cir. 2014) (citing *Lindy Lu LLC v. Ill. Cent. R.R. Co.*, 984

N.E.2d 1171, 1175 (Ill. App. Ct. 2013)).  Thus, to prevail on summary judgment, Apex AMR

must point to sufficient evidence supporting each of these elements.  *See Spitz*, 759 F.3d at 730

(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

---

[9] For these same reasons, the Apex Parties are not entitled to specific performance under the
Agreement because Dr. Arif properly terminated the Agreement as of February 2015.

## A.     Valid and Enforceable Contract

The parties do not dispute the validity of the Agreement that Dr. Arif and Apex AMR entered into in June 2011.  (*See* Stmt. of Undisputed Facts, ¶ 23; R.32, at 8 ("The parties agree that the Agreement is a valid contract entered into between Apex AMR and Dr. Arif"); R.35, at 1-2 ("It is therefore undisputed that the Agreement is the sole document setting forth Dr. Arif's responsibilities to the Apex Parties").)  As such, no genuine issues of material fact exist that preclude a finding that the Agreement is a valid and enforceable contract.

## B.     Parties' Performance

Under Illinois law, a "party cannot sue for breach of contract without alleging ... that he has himself substantially complied with all the material terms of the agreement."  *Reserve Hotels PTY Ltd. v. Mavrakis*, 790 F.3d 738, 740 (7th Cir. 2015) (*citing George F. Mueller & Sons, Inc. v. N. Ill. Gas Co.,* 32 Ill. App. 3d 249, 336 N.E.2d 185, 189 (Ill. App. Ct. 1975)); *Costello v. Grundon*, 651 F.3d 614, 620 (7th Cir. 2011) (citations omitted); *Levin v. Grecian*, 974 F.Supp.2d 1114, 1122 (N.D. Ill. 2013).  Indeed, "performance of contractual conditions is one of the essential elements of a breach of contract action."  *Wilbur v. Potpora*, 123 Ill. App. 3d 166, 169, 462 N.E.2d 734, 736, 78 Ill. Dec. 615 (Ill. App. Ct. 1984) (citations omitted); *Mack Indus., Ltd. v. Vill. of Dolton,* 2015 IL App (1st) 133620, ¶ 29, 30, 30 N.E.3d 518, 391 Ill. Dec. 248 ("The essential elements of a breach of contract are: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) resultant injury to the plaintiff"); *Segall v. Berkson,* 139 Ill.App.3d 325, 332, 487 N.E.2d 752, 757, 93 Ill. Dec. 927 (1985) ("[t]o state a cause of action for breach of contract, a plaintiff must allege … the plaintiff's performance of all contractual obligations required of him or her, ….").

Genuine issues of material fact exist surrounding the performance of both parties under the Agreement—including performance by Apex AMR and Dr. Arif before Dr. Arif sent the termination notice. These disputed facts preclude summary judgment because they are material to the Court's determination of the parties' performance and breach in regard to Apex AMR's breach of contract claim.[10]

The Arif Parties contend that Apex AMR did not fulfill its payment obligations under the Agreement. The undisputed facts establish that the Agreement specified distribution of Total Grant Revenue to be divided with 85% to Apex Michigan and 15% to Apex AMR. (R.14-1, Section V.1.c.; R.21, Answer, ¶ 26) According to the Arif Parties, in August 2014, Dr. Arif asked Arif P.C. personnel to conduct a review of payments due and to ask trial sponsors about payments they had made to Apex AMR. (R.39, Stmt. of Addt'l Facts, ¶ 18.) That review identified a series of five payments Merck, Sharp & Dohme made to Apex Michigan—four of which they made in 2013—that Apex AMR kept rather than sharing with Dr. Arif as required by the Agreement. (*Id.*, ¶ 19.) Shortly after discovering these payment discrepancies, Dr. Arif sent his notice of termination letter in December 2014. (*Id.*, ¶ 20.) It is undisputed that Dr. Arif's notice of termination letter stated that he "recently learned that Apex has failed to perform its obligations under the Agreement by not paying Dr. Arif upon receipt of proceeds from clinical trial studies and by not submitting invoices/billings to the companies for which the clinical trials are being performed." (R.14-1, at 1.) The letter further stated that "[a]s a result of Apex's breach of the Agreement, Dr. Arif is exercising his rights to terminate the Agreement." (*Id.*, at 2.)

---

[10] The same genuine issues of material fact preclude summary judgment of the Apex Parties breach of fiduciary duty claim as discussed *infra*, Section V.

While the parties do not dispute the existence of at least one payment discrepancy, the amount of that discrepancy as well as the extent to which additional payment discrepancies exist, however, is disputed. By letter dated April 29, 2015, following the institution of this lawsuit, a representative of Apex AMR and its affiliates sent a letter to counsel for Dr. Arif, enclosing a check for $18,009.29 to purportedly "rectify the error" of the Merck Sharpe & Dohme payments. (Stmt. of Addt'l Undisputed Facts, ¶ 24.) Dr. Arif (through counsel) returned the check on May 12, 2015, along with a cover letter noting that the $18,009.29 amount bore no relationship to the discrepancy amounts identified in Dr. Arif's investigation, and that further investigation revealed that Apex AMR received thirteen other payments from two additional sponsors well prior to termination. (*Id.*, ¶¶ 25, 26; *see also* R.36-1, Arif Decl., ¶¶ 11, 12; R.36-2, ¶ 5; Ex. 4, May 12, 2015 Letter (identifying payments specified by third party, protocol name, and dates that were withheld).) Apex AMR notes that the $18,009.29 amount actually exceeds the amount to which Dr. Arif claims he is entitled in his Rule 26(a)(1) disclosures and denies that the amount bore no relationship to the discrepancy amounts Dr. Arif's investigation identified relating to the Merck Sharpe & Dohme agreement. (*Id.*, Response, ¶ 25.) In addition, in regard to their Counterclaim, the Arif Parties have alleged that "[f]ollowing receipt of the December 9 Letter, Apex AMR and Apex Michigan have, however, withheld all payments received for work performed by Dr. Arif and the Arif P.C. personnel, and have failed to provide any accounting for those payments. To date, CounterDefendants are known to have received in excess of $200,000 owed to Dr. Arif and the Arif P.C." (R.21, Counterclaim, ¶¶ 1, 57.)

As such, the existence of disputed facts, material to whether Apex AMR substantially performed under the Agreement prior to its termination, precludes a determination in favor of Apex AMR on summary judgment.

### C.     Breach

Apex AMR has also failed to establish Dr. Arif's activities related to AA MRC and procurement or involvement in new clinical trials constitute a breach prior to the effective date of termination of the Agreement.  Apex AMR argues that Dr. Arif breached the exclusivity provisions of the Agreement prior to its termination when he formed AA MRC and when he redirected payments owed under Apex AMR and Apex Michigan contracts to Apex Flint.  (R.32, at 11.)  Without reference to case law, Apex AMR argues that Dr. Arif's mere formation of AA MRC in May 2014 constitutes a breach.  Apex AMR asserts that it "is entitled to partial summary judgment for the contractual breaches of exclusivity that occurred from May 2014 through February 7, 2015, regardless of whether Dr. Arif's purported termination was ultimately effective after that date."  (*See* R.38, at 9.)  Apex AMR, however, fails to provide sufficient evidence for the Court to find as a matter of law that it is entitled to summary judgment based on Dr. Arif's alleged breach.  Put differently, the additional evidence upon which Apex AMR relies to show that Dr. Arif generated and conducted clinical trial work for AA MRC prior to termination of the Agreement is insufficient to establish breach.  Apex AMR argues that Dr. Arif breached the exclusivity provisions of the Agreement prior to its termination when he formed AA MRC with the intent to use that company to establish clinical trials for his Flint, Michigan clinical site.  (R.32, at 11.)  The parties do not dispute, however, that Dr. Arif agreed to contract with trial sponsors exclusively through Apex AMR during the term of the Agreement as provided by Section IV.2.a.  (Stmt. of Undisputed Facts, ¶ 39; R.21, Answer, Counterclaim, ¶¶ 1, 18, 31; R.14-1, Section IV.2.a. ("providing that Apex Michigan agreed "to not seek or accept any clinical trials not procured under the terms of the Agreement").)  The parties further do not dispute that Dr. Arif formed AA MRC in May 2014 and that he is currently using AA MRC as

the contracting entity to enter into new clinical trial agreements with third party sponsors, independent of Apex AMR and Apex Michigan. (Stmt. of Undisputed Facts, ¶¶ 40, 41.) Apex AMR and Apex Michigan have no affiliation or contractual relationship with AA MRC. (*Id.*, ¶ 42.)

Apex AMR fails to provide evidence in support of summary judgment, however, that identifies inquiry or entry into clinical trial agreements via AA MRC that occurred prior to the date of termination—effective February 7, 2015. Apex AMR submitted email correspondence beginning December 9, 2014 and extending to April 2015. The relevant period for considering such correspondence, however, ends when the Agreement ends—February 7, 2015. Apex AMR argues that Dr. Arif's unilateral instruction to trial sponsors to direct payments to Apex Flint and use of a separate business entity constitute breach of the Agreement. In support of their position, Apex AMR submitted a group of emails, only two of which were sent or received during the relevant time period—one email received on December 10, 2014 and another email sent on February 6, 2015.

According to Ms. Ahmed's declaration, a clinical trial sponsor sent an email to a member of Arif's staff (Fayyaz Shah) on December 10, 2014 "regarding a new clinical trial referred to in the email subject line by [redacted study name]." (R.39-1, ¶ 11.)[11] The email does not, however, provide sufficient evidence that Dr. Arif was entering into *new* clinical trials using Apex email addresses. First, the email was not sent by Dr. Arif's staff, but was merely received by fshah@apexmedicalresearch.com from a third party—a clinical trial sponsor that Ms. Ahmed admits "has contracted with [Apex] previously." (*See* R.39-1, ¶ 11.) Second, the email generally

---

[11] The Apex Parties did not seek leave of Court to file their Reply and its exhibits under seal, yet they have treated the filings as under seal by redacting information in the filed versions and providing unredacted versions to the Court. The Court orders the Apex Parties to file, under seal, unredacted versions of the Reply (R.39) and its exhibits (R.39-1; R.39-2).

includes reference to numbers designated as an "IRB ID" and a "Protocol", but does not provide any additional evidence linking these numbers to new clinical trials. The email further references a document being made available by "SilverLink" to the recipient and states that "[y]ou are receiving this email because you are listed as a Site Coordinator for the above mentioned study". (*See* R.39-2, Ex. B., Email Correspondence.) The Apex Parties did not provide the document referenced in the email, nor did they provide evidence demonstrating that the "above mentioned study" is a new clinical trial.

In the second email upon which the Apex Parties rely, Sajjad Shah (another member of Dr. Arif's staff) used his AA MRC email address (sshah@aamrc.net) to inquire about redirecting clinical trial payments. (R.39, Resp. to Arif Parties' Addt'l Stmt. of Facts, ¶¶ 29, 31, 33; R.39-1, Ahmed Suppl. Decl., Aug. 10, 2015, ¶¶ 11, 12; R.39-2, Ex. C, Email Correspondence.) As with the previous email, the February 6, 2015 email—sent the day before termination of the Agreement became effective—is insufficient to support the Apex Parties' claim. Namely, the February email does not suffice to prove that Dr. Arif and his staff were using their Apex email addresses because it was sent from an AA MRC email address and does not suffice to show that Dr. Arif was procuring new clinical trials through AA MRC because the email is in direct reference to an existing clinical trial procured by Apex AMR when the Agreement was in force. Indeed, the email string indicates that the trial sponsor with whom Dr. Arif's staff was corresponding was aware of the dispute, stating "[i]t has been brought to [named trial sponsor's] attention that Dr. Arif's site wishes to remove Apex Medical Research from the CTA and assign the CTA to their Research Organization due to disputes over payments not being received." (*See* R.39-2, at Ex. C.) Together, these emails do not provide sufficient evidence that Dr. Arif

breached the Agreement prior to the effective date of termination.[12]  Taken in the light most

favorable to Dr. Arif, the Apex Parties' claim for breach of contract is not supported by the

evidence and Apex AMR is not entitled to judgment as a matter of law on Count I.[13]

### III.    Apex AMR Is Entitled to Summary Judgment on Counter-Plaintiffs' Unjust Enrichment Claim

Under Illinois law, a plaintiff cannot recover for unjust enrichment when there is a

specific contract that governs the relationship between the parties.  *See Omnicare, Inc. v.*

*UnitedHealth Grp. Inc.*, 629 F.3d 697, 723 (7th Cir. 2011) (applying Illinois law and upholding

grant of summary judgment on an unjust enrichment claim where a specific contract governed

the parties relationship); *see also National Production Workers Union Ins. Trust v. Cigna Corp.*,

665 F.3d 897, 905 (7th Cir. 2011) (affirming grant of summary judgment on an unjust

enrichment claim because under Illinois law "when two parties' relationship is governed by

contract, they may not bring a claim of unjust enrichment unless the claim falls outside the

contract"); *see also Stevens v. Interactive Fin. Advisors, Inc.*, No. 11 C 2223, 2015 WL 791384,

at *16-17 (N.D. Ill. Feb. 24, 2015) (*citing Indust. Lift Truck Serv. Corp. v. Mitsubishi Int'l Corp.*,

104 Ill. App. 3d 357, 360, 432 N.E.2d 999, 1002, 60 Ill. Dec. 100 (Ill. App. Ct. 1982)) ("So long

---

[12] The Court notes that the Apex Parties submitted additional emails dated January 21, 2015, January 22, 2015, and January 19, 2015, with Plaintiffs/Counter-Defendants' Motion to Strike Defendants/Counter-Plaintiffs' Supplemental Brief.  (*See* R.42-2, Boothe Decl., Ex.2, Ex. 3.)  The Apex Parties submit and argue in reference to these exhibits for the first time in supplemental briefing and the Court, therefore, does not consider them.  *See e.g., Darif v. Holder,* 739 F.3d 329, 336 -337 (7th Cir. 2014) ("Arguments raised for the first time in a reply brief are waived").  To the extent these or other exhibits referenced in the Apex Parties supplemental briefing were received by counsel only after briefing related to the pending motions was underway, this highlights the potentially premature nature of these motions being presented to the Court when the parties are still exchanging discovery.

[13] Because Apex AMR failed to establish Dr. Arif's breach of the Agreement based on the undisputed facts, the Court need not consider whether Apex AMR provided sufficient evidence to prove any damage as a result of Dr. Arif's breach.  *See Spitz,* 759 F.3d at 730 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)) (explaining that to prevail on summary judgment, the movant must point to sufficient evidence supporting each of the necessary elements.)

as 'a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests,' the existence of a contract bars a claim for unjust enrichment). The Arif Parties assert that the unjust enrichment claim responded to the Apex Parties' earlier allegation that Dr. Arif was not a party to the Agreement and instead the Agreement was with an unidentified subsidiary for which Dr. Arif is the principal physician. (*See* R.35, at 19.) The Apex Parties responded and admit that the Agreement governs "the relationship between Apex AMR and Dr. Arif." (*See* R.38, at 2.) Because the parties do not dispute the validity and enforceability of the Agreement, the Court grants Apex AMR's motion for summary judgment as to Counter-Plaintiffs' unjust enrichment claim.

## IV. The Parties Are Not Entitled to Summary Judgment on the Apex Parties' Breach of Fiduciary Duty Claim

The parties have cross-moved for summary judgment as to the Apex Parties' breach of fiduciary duty claim. (R.14, ¶¶, Count IV; R.34; R.41.) Under Illinois law, a plaintiff asserting a claim for breach of fiduciary duty must prove that "(1) a fiduciary duty exists; (2) the fiduciary duty was breached; and (3) the breach proximately caused the injury of which the plaintiff complains." *Ball v. Kotter*, 723 F.3d 813, 826 (7th Cir. 2013) (*citing Neade v. Portes*, 193 Ill.2d 433, 442, 250 Ill. Dec. 733, 739, 739 N.E.2d 496, 502 (2000)). The Apex Parties argue that Dr. Arif owes a fiduciary duty to Apex Michigan and that his actions in unilaterally diverting payments on Apex AMR and Apex Michigan contracts to a separate entity under his exclusive control were a breach of his fiduciary duties. Plaintiffs further contend that Dr. Arif's secret formation of a competing business—AA MRC—and his actions hiding his activities form Apex AMR for approximately six months while a shareholder of Apex Michigan constitutes a breach of his duty of loyalty.

The Apex Parties contend that "Dr. Arif owes fiduciary duties to Apex AMR because he is an equal 50% shareholder in Apex Michigan, a de facto closely held corporation for whose management and business operations he is jointly responsible." (R.32, at 14.) The Arif Parties respond noting that the Apex Parties have slightly changed their tune as they previously asserted that Dr. Arif owed Apex AMR and Apex Michigan fiduciary duties that arose out of a joint venture to establish a clinical trial business memorialized by the Agreement. (*See* Stmt. of Addt'l Undisputed Facts, ¶ 8; R.14, Amd. Compl., ¶¶ 65-70 (Count IV).) Nonetheless, the Arif Parties assert that regardless of whether Apex Michigan is a joint venture or closely held corporation, no fiduciary duty is imposed on Dr. Arif given the terms of the Agreement and the admissions in the pleadings. (*See* R.35, at 4.)

A. **Genuine Issues of Material Fact Exist Regarding Whether Apex Michigan is a Joint Venture**

A joint venture is an association of two or more persons to carry out a single enterprise for profit. *Powell v. Dean Foods Co.,* 2013 IL App (1st) 082513-B, ¶ 76, 379 Ill. Dec. 675, 7 N.E.3d 675, 699 (citations omitted). No formal agreement is necessary to form a joint venture, as its existence may be inferred from the circumstances. *Id; Hiatt v. Western Plastics, Inc.*, 2014 IL App (2d) 140178, ¶ 73, 394 Ill. Dec. 561, 36 N.E.3d 852, 865. Once established as a joint venture, fiduciary duties exist as a matter of law. *See Autotech Tech. Ltd.*, 471 F.3d at 748 ("[f]iduciary duties exist as a matter of law in certain relationships including partnerships and joint ventures"). Under Illinois law, a joint venture requires (1) an express or implied agreement to carry on an enterprise; (2) a demonstration of intent to be joint venturers; (3) a community of interest, as reflected in the contribution of property, money, effort, skill, or knowledge; (4) a measure of joint control and management of the enterprise; and (5) sharing of profits or losses. *Hiatt*, 2014 IL App (2d) 140178, ¶ 73; *see also Autotech Tech. Ltd. v. Automationdirect.com*,

471 F.3d 745, 748 (7th Cir. 2006) (*citing Trustmark Ins. Co. v. Gen & Cologne Life Re of Am.*, 424 F.3d 542, 547 (7th Cir. 2005)). "In the absence of any one of these elements, no joint venture exists." *Hiatt*, 2014 IL App (2d) 140178, ¶ 73; *Powell*, 2013 IL App (1st) 082513-B, ¶ 77. "The burden of proving a joint venture is on the person who claims such a relationship exists." *Quadro Enter., Inc. v. Avery Dennison Corp.*, No. 97 C 5402, 2000 WL 1029176, at *5 (N.D. Ill. July 26, 2000) (*citing Barton v. Evanston Hosp.,* 159 Ill. App. 3d 970, 973, 513 N.E.2d 65, 67, 111 Ill. Dec. 819 (Ill. App. Ct. 1987); *O'Brien v. Cacciatore,* 227 Ill. App. 3d 836, 843, 591 N.E.2d 1384, 1389, 169 Ill. Dec. 506 (Ill. App. Ct. 1992)). Ordinarily, the existence of a joint venture is a question of fact for the trier of fact. *Hiatt*, 2014 IL App (2d) 140178, ¶ 73.

Here, there is an express agreement to carry on an enterprise with a common interest, as the Agreement explicitly states that the parties agreed to carry on an enterprise for the purpose of "provid[ing] grant opportunities and thereof to [Apex Michigan] in conducting clinical trials." (*See* R.14-1, at 1.) In addition, the parties agree that the Agreement they entered into on June 11, 2011, is valid and enforceable, and that Dr. Arif agreed with Apex AMR to have Apex AMR procure clinical trial agreements under which he would conduct the work associated with clinical trials and that, pursuant to that agreement, he agreed to designate his clinical trial location as an "Apex" site. (*See* Stmt. of Undisputed Facts, ¶¶ 20, 23.) The undisputed facts also demonstrate a community of interest reflected in the contribution of Apex AMR's expertise in procuring and managing clinical trial agreements and Dr. Arif's medical expertise in conducting clinical trials. Indeed, the Arif Parties admit that in 2006, "Dr. Ahmed and Ms. Ahmed discussed with Dr. Arif having Apex AMR act as Dr. Arif's agent for procuring clinical trial agreements." (R.36, ¶ 19, Response.)

There are genuine issues of material fact, however, surrounding what is "[p]ossibly, the most important criterion of a joint venture"—"joint control and management of the property used in accomplishing its aims." *See Indus. Kinetics, Inc. v. Cinetic Automation Corp.*, No. 12-CV-03459, 2014 WL 6612979, at *3 (N.D. Ill. Nov. 21, 2014) (*citing Herst v. Chark*, 219 Ill. App. 3d 690, 694, 579 N.E.2d 990, 162 Ill. Dec. 176 (Ill. App. Ct. 1991)). In looking at the joint control and management of the property, courts must determine whether the parties exerted a "right to direct and govern the policy and the conduct of the other in connection with the joint venture." *Barton*, 513 N.E.2d 65, 67. Additional considerations include "whether the parties manage their own affairs separately, whether they appoint persons to management positions within the joint venture, whether they control the methods or policies used by each other, whether they exert or attempt to exert control over the work of the joint venture, and whether any right to control is one-sided rather than mutual." *Quadro Enter.*, 2000 WL 1029176, at *7.

Although the Agreement contemplates the parties' independent roles, it also attributes "Obligations of the Parties with Respect to Services" that show potential for overlap in the decisions related to the clinical trials, even after they are procured. The Agreement generally provides that Apex AMR is responsible for procuring the clinical trial agreements whereas Dr. Arif is responsible for conducting the work associated with those agreements at his clinical trial site in Michigan, designated as an "Apex" site for the purposes of those trials. (Stmt. of Undisputed Facts, ¶ 20.) The Agreement further states that Apex Michigan "agrees to conduct all clinical trials and acts leading to obtaining clinical trials according to the instructions, policies, and principles of Apex-AMR". (R.14-1, Section IV.2.b.) The Agreement gives explicit independence to Apex Michigan and Dr. Arif regarding conduct of the clinical trial once obtained, however, stating:

> In the performance of the services, duties, and obligations undertaken by [Apex Michigan] under this Agreement or any clinical trial obtained as a result of this Agreement, it is mutually understood and agreed that [Apex Michigan] will at all times act and perform as an independent entity. Apex-AMR shall not have, nor exercise any direct control over the methods by which [Apex Michigan] shall perform professional work and services except that [Apex Michigan] agree to perform their work and services at all times in strict accordance with the research protocol, policies and timeless provided by sponsor and currently approved methods of the practice of clinical research.

(R.14-1, Section VI.) The Apex Parties do not assert, nor is there a provision in the Agreement to support, that Dr. Arif had any right to exercise control over Apex AMR or direct its work in any fashion and the Agreement clearly indicates that Apex AMR did not have the right to dictate control over the methods of Apex Michigan in performing the trials. *See Hiatt*, 2014 IL App (2d) 140178, ¶ 90 (*citing Herst,* 219 Ill. App. 3d at 696) (the element of shared control requires only "some right by the parties to direct and govern the conduct of each other in connection with the joint venture"); *U.S. Golf Sys., Inc. v. WPI Acquisition Corp.*, No. 91 C 1362, 1994 WL 225384, at *3 (N.D. Ill. May 24, 1994) (citations omitted) (same).

While the Agreement's language disclaiming direct control over Apex Michigan by Apex AMR counsels against a joint venture, additional portions of the Agreement and the disputed facts make this conclusion murky. The Agreement, for example, also states that Apex-AMR shall "provide Apex-MI guidance to conduct clinical trials" and "provide guidance related to marketing and recruitment of study subjects." (R.14-1, at Sections IV.1.b & d.) The Agreement, therefore, contains provisions that do not establish an absence of joint control and management between the parties. *See Hiatt*, 2014 IL App (2d) 140178, ¶ 73 (explaining that in the absence of any one of the elements necessary to establish a joint venture, none can exist).

Furthermore, in addition to the Agreement, the Court must look to the parties' intent in determining whether a joint venture exists. See *id.* (internal citations omitted) ("A joint venture

is a creation of contract law … and whether one exists is a question of the parties' intent"). Indeed, the parties dispute the level of involvement that Apex AMR had with Dr. Arif in the setup and day-to-day operations of the business, as well as Apex AMR's involvement in providing clinical consult during at least one clinical trial.  (*See e.g.,* R.39, ¶¶ 14, R.36-1, Ahmed Decl., ¶ 9.)  These genuine issues of material fact preclude a finding as to whether the parties formed a joint venture through Apex Michigan.  *See e.g., Ambuul v. Swanson*, 162 Ill. App. 3d 1065, 1069, 516 N.E.2d 427, 430, 114 Ill. Dec. 272 (Ill. App. Ct. 1987) (looking at the day-to-day management of the enterprise in considering whether the plaintiff had a right to direct and govern the defendant's conduct).  Accordingly, the Court finds that genuine issues of material fact exist regarding whether the parties formed a joint venture under the Agreement.

**B.      Genuine Issues of Material Fact Exist Regarding Whether Dr. Arif Owes Fiduciary Duties to Apex Michigan, a Closely Held Corporation**

The inquiry, however, does not end there, as the Apex Parties have further asserted Dr. Arif owes a fiduciary duty to Apex AMR, not by creation of a joint venture, but by a closely held corporation.  Indeed, Apex AMR also argues that it is entitled to summary judgment on its breach of fiduciary duty claim because under Illinois law, Apex Michigan is a *de facto* closely held corporation, with Dr. Arif and Apex AMR owing each other fiduciary duties.

The parties do not assert that Apex Michigan was organized or registered as a close corporation under the Close Corporation Act.  This fact does not preclude a finding, however, that Apex Michigan, for all practical purposes acted as a close corporation.  *See Hagshenas v. Gaylord*, 199 Ill. App. 3d 60, 69, 557 N.E.2d 316, 322, 145 Ill. Dec. 546 (Ill. App. Ct. 1990).  An Illinois corporation may qualify as a close corporation under common law principles even if it is not incorporated under the Close Corporation Act.  *See Rexford Rand Corp. v. Ancel,* 58 F.3d 1215, 1218-19 (7th Cir. 1995).  Under Illinois common law, a close corporation is "one in which

the stock is held in a few hands, or in a few families, and wherein it is not at all, or only rarely, dealt in by buying or selling." *Hagshenas*, 557 N.E.2d at 322; *Talton v. Unisource Network Servs., Inc.*, No. 00 C 7967, 2004 WL 2191605, at *16 (N.D. Ill. Sept. 27, 2004) (*citing Galler v. Galler,* 32 Ill.2d 16, 203 N.E.2d 577, 583 (Ill. 1964)). The parties do not dispute that Dr. Arif and Apex AMR (through Ms. Ahmed) have equal interests as 50% shareholders of Apex Michigan. (Stmt. of Undisputed Facts, ¶ 28.) The stock in Apex Michigan is illiquid and there has been no purchase or sale or other transfer of Apex Michigan stock since its incorporation. (*Id.*, ¶¶ 28, 30.) Apex Michigan has a single director, Ms. Ahmed, and as noted by the Illinois Secretary of State, at least one officer—Ms. Ahmed, President. (*See id.*, ¶¶ 28, 30; *see also* R.36-2, Corporation File Detail Report, Website, Illinois Secretary of State.) There are no genuine issues of material fact that preclude a determination that Apex Michigan meets the common law definition of a close corporation because its stock has not been dealt in by buying or selling and is held in a few hands. *See Hagshenas*, 557 N.E.2d at 322; *see also Monfardini v. Quinlan*, No. 02 C 4282, 2004 WL 533132, at *4 (N.D. Ill. Mar. 15, 2004) (finding corporation closely held where the "stock [is] held by only a few people and the stock is not, or rarely, bought or sold").

The fact that Apex Michigan is a closely held corporation, however, does not impose a fiduciary duty on Dr. Arif as a 50% shareholder in Apex Michigan as a matter of law. *See Dowell v. Bitner*, 273 Ill. App. 3d 681, 690, 210 Ill. Dec. 396, 652 N.E.2d 1372, 1379 (Ill. App. Ct. 1995) ("in general, a mere owner of stock does not owe a fiduciary duty to the corporation"); *Talton*, 2004 WL 2191605, at *13 ("[S]hareholders in a close corporation owe fiduciary duties to other shareholders, at least where they are involved at something more than the level of a mere shareholder"). In determining whether a shareholder in a close corporation has a fiduciary duty,

"courts look at a shareholder's ability to hinder, influence, or control the corporation." *Dowell v. Bitner*, 273 Ill. App. 3d 681, 690, 210 Ill. Dec. 396, 652 N.E.2d 1372, 1379 (Ill. App. Ct. 1995); *Monfardini*, 2004 WL 533132, at *5. If a fiduciary duty is found to exist, the stockholder must discharge his management and stockholder responsibilities in conformity with the utmost good faith and loyalty and "may not act out of avarice, expediency or self-interest in derogation of his duty of loyalty to the other stockholders and to the corporation." *See Hagshenas*, 557 N.E.2d at 323.

As discussed above, there are genuine issues of material fact related to the level of control Apex AMR and Dr. Arif had over Apex Michigan. On the one hand, Dr. Arif has a unique role as the Principal Investigator for all of the clinical trials entered into by Apex Michigan. Indeed, the parties do not dispute that Dr. Arif signed each clinical trial contract as the Principal Investigator. (*Id.*, ¶ 35.) The Agreement, as discussed above, also provides Dr. Arif an autonomous role in the clinical conduct of the Apex Michigan trials once they are obtained. As the Arif Parties admit, even the initial standard operating procedures manual that Apex AMR provided required extensive revisions which Dr. Arif and his staff undertook. On the other hand, however, the Agreement provides that Apex AMR "shall provide Apex-MI guidance to conduct clinical trials" and "shall provide guidance related to marketing and recruitment of study subjects." (R.14-1, Section IV.) In addition, the Agreement provided that for its term, "Apex-MI agrees to not seek or accept any clinical trials not procured under the terms of this Agreement" and "agrees to conduct all clinical trials and acts leading to obtaining clinical trials according to the instructions, policies, and principals of Apex-AMR." (*Id.*) These inconsistencies present genuine issues of material fact that prevent a finding in favor of either party as to whether Dr. Arif owes a fiduciary duty to Apex Michigan, a closely-held corporation

under Illinois law.  Accordingly, the Court denies both parties' motion as to the Apex Parties'

breach of fiduciary duty claim (R.14, Count IV).[14]

## CONCLUSION

For the reasons stated above, the Court grants the Apex Parties' motion for partial

summary judgment in regard to Counter-Plaintiffs' unjust enrichment claim (R.21,

Counterclaim, Count II) and denies Plaintiff Apex AMR's motion for partial summary judgment

on its claims for breach of contract and breach of fiduciary duty against Dr. Arif (R.14, Counts I

and IV).  (R.30.)  The Court further grants the Arif Parties' motion for partial summary judgment

as to their Counterclaim against the Apex Parties regarding termination of the Agreement (R.21,

Counterclaim, Count VII) and denies the Arif Parties' cross-motion for partial summary

judgment as to Plaintiffs' breach of fiduciary duty claim (R.14, Count IV).  (R.34.)


**DATED:  November 18, 2015**                    ENTERED

                                                _____
                                                AMY J. ST. EVE
                                                United States District Court Judge


---

[14] Because the Court finds genuine issues of material fact preclude a finding as to whether Dr.
Arif owed a fiduciary duty to Apex Michigan, the Court need not address whether the undisputed facts
establish Dr. Arif's breach of any duty or whether the Apex Parties' suffered damages as a result of any
breach.  *See Ball,* 723 F.3d at 826 (*citing Neade,* 193 Ill. 2d at 442) (explaining under Illinois law the fact
that all three elements—"(1) a fiduciary duty exists; (2) the fiduciary duty was breached; and (3) the
breach proximately caused the injury of which the plaintiff complains"—are necessary to establish a
breach of fiduciary duty claim).